IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | | |
|---|---|---|
| WALKER CENTRIFUGE SERVICES, L.L.C., | § § § § | |
| Plaintiff, | § § | |
| VS. | § | NO. 4:08-CV-068-A |
| D&D POWER, L.L.C., ET AL., | § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
and
ORDER

Having considered the motion of defendants, D&D Power, L.L.C. ("D&D"), Donald Chapman ("Chapman"), and J. Andrew Rottner ("Rottner"), to dismiss or stay, the response thereto of plaintiff, Walker Centrifuge Services, L.L.C. ("WCS"), defendants' reply, the record, and applicable authorities, the court concludes that it should abstain from hearing the claims asserted in this action by dismissing them without prejudice.[1]

I.

Background

By original complaint filed February 1, 2008, plaintiff initiated the above-captioned action. This action is closely

---

[1] Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), stands for the proposition that the federal court can consider dismissal of the federal action when it determines that abstention is warranted. See id. at 819.

related to another, which was removed to this court by plaintiff and others (as defendants in state court), only then to be remanded by the undersigned back to the state court from which it was removed. See generally Memorandum Opinion and Order signed December 17, 2007, in No. 4:07-CV-579-A, D&D Power, L.L.C. v. Walker Centrifuge Services, L.L.C., Et Al. Defendants now ask the court to abstain from the above-captioned action by virtue of the fact that the action described in such December 17 order of remand is currently pending in state court.

A. Allegations in the State Court Action.

By original petition filed on July 17, 2007, in the 271st Judicial District Court of Wise County, Texas, D&D initiated the state court action. In its first amended petition, filed on April 1, 2008, D&D makes the following allegations:[2]

D&D is an oilfield services company, providing its services in and around the Barnett Shale area of North Texas. In 2006, D&D "explored the prospect of operating a closed loop system for solids control . . . ." Defs.' App. at 39, ¶ 4.1. D&D approached WCS to see if WCS would import large centrifuge units that D&D could use in connection with its closed-loop system. WCS had no experience in the Barnett Shale region, nor did it have any experience in the operations of closed-loop systems for natural gas exploration and drilling. In December 2006, D&D and WCS agreed to enter into a lease, whereby WCS would import large

---

[2] D&D's First Amended Petition can be found at pages 37-53 of plaintiff's appendix.

2

centrifuge units, fabricate them to the specifications of D&D, and lease them to D&D. WCS agreed to lease D&D a minimum of ten units as they became available in 2007, at a rate of $800 per day. WCS represented that it would provide as many units as D&D could operate, and that it was a long-term commitment. D&D launched its closed-loop system in February 2007, which "created substantial enthusiasm and market demand . . . ." Id. at 40, ¶ 4.5.

Meanwhile, "WCS and others were pursuing a hidden agenda and engaged in a conspiracy and course of conduct designed to take over the closed loop operations of D&D . . . ." Id. at 41, ¶ 4.7. WCS ultimately created a new entity, Premier Solids Control ("PSC"), "to take over the profitable line of business developed by D&D . . . regarding its closed loop operation." Id. Charles Walker ("Walker"), principal of WCS, attempted to induce Donald Chapman ("Chapman") and Charlie Birchell ("Birchell"), two of D&D's managers, to go to work for PSC. Chapman declined, but Birchell traveled to Kansas to meet with WCS representatives. While WCS schemed its new competing entity, its representatives continued to negotiate a formal written lease agreement with D&D regarding the closed-loop system centrifuge units, so as not to arouse D&D's suspicions.

On June 29, 2007, WCS sprang its trap, with Brett Williamson ("Williamson"), president of WCS traveling to Texas to inform D&D that WCS would no longer provide the centrifuge units to D&D. Birchell left D&D to go to work for PSC. WCS threatened to go to

D&D's job sites and remove the centrifuge units it had already provided. Despite the lease specifying ten units, WCS had only provided four units to D&D, and ended up retaking possession of those four units. WCS and others completed their scheme by inducing several D&D employees to leave and go to work for PSC.

Based on the foregoing, D&D alleges that: (1) WCS breached the lease agreement by failing to provide ten centrifuge units;[3] (2) the former employees of D&D breached fiduciary duties owed to D&D in their secret dealings with WCS and others; (3) WCS, Walker, Williamson, PSC, and another defendant induced the former employees of D&D to breach their fiduciary duties; (4) WCS, Walker, Williamson, PSC, and another defendant aided and abetted the breach of fiduciary duties by the former employees of D&D; (5) WCS, Walker, Williamson, PSC, and Birchell misappropriated the centrifuge closed-loop system developed by D&D; (6) WCS, Walker, Williamson, PSC, and others misappropriated trade secrets; (7) WCS and PSC unfairly competed with D&D and were thereby unjustly enriched; (8) one of the former employees of D&D that went to work for PSC breached a covenant not to compete; (9) WCS, Walker, Williamson, PSC, and others tortiously interfered with D&D's contract with the D&D employees that subsequently went to work for PSC; (10) WCS, Walker, Williamson, PSC, and others

---

[3] WCS notes that D&D did not amend its petition during the first nine months the state court action was pending. The amended petition was filed on April 1, 2008, a few weeks after D&D and the other defendants herein filed the instant motion. WCS takes the position that D&D amended its petition solely as an "attempt[] to create parallel litigation to supports its desire to have the case stayed." Resp. at 7.

4

interfered with D&D's prospective business relations; (11) WCS, Walker, Williamson, and PSC committed fraud; and (12) WCS, Walker, Williamson, PSC, and others engaged in civil conspiracy.

B.  Allegations in the Federal Action.

In the complaint by which WCS initiated the above-captioned action, it alleges that:

It sells centrifuges throughout the world and operates "a successful contracting business whereby [it] removes and dewaters debris and sediment from large tanks, lagoons, and industrial pits using a proprietary method it developed." Compl. at 3, ¶ 7. On November 14, 2006, Chapman traveled to Kansas to meet with Williamson to obtain pricing information for several centrifuge units. Chapman requested that WCS design centrifuges with the same technical specifications as the DE-1000 centrifuge, which Chapman was familiar with based on his former employer's use thereof. Chapman represented to Williamson and WCS that "D&D wanted to replicate the 'closed-loop' solids control services employed by [his former employer]." Id. at 4, ¶ 8. WCS explains that:

> In the oil and gas industry, the fluid that has been used in connection with the drilling of a well is dealt with in two different ways. The first method is to simply build a pit known as a reserve pit to hold the used drilling fluid until it is disposed of with [sic] at a later time. The second method is to employ a 'closed-loop' solids control service . . . ."

Id. ¶ 9. Prior to approaching WCS, D&D had not been in the closed-loop business, and did not own any closed-loop systems.

5

Chapman represented that D&D was hoping to join the ranks of other solids control companies providing closed-loop systems.

D&D could not afford to buy the equipment from WCS, so it attempted to negotiate a lease. WCS does not normally lease its products, but eventually agreed to do so after meeting with Chapman and Rottner, D&D's president, and Dennis Bennett ("Bennett"), a member of D&D. Rottner and Bennett "substantiated Chapman's claims regarding the demand for Closed-Loop Systems in North Texas," id. at 5, ¶ 12, so WCS agreed to lease a mobile dewatering unit to D&D so that D&D could evaluate the feasibility of further pursuing the endeavor. WCS and D&D signed an evaluation period agreement, which provided that: (1) D&D would abandon its plan to utilize mobile dewatering units similar to the DE-1000 and would instead embrace the larger, more sophisticated WCS units; (2) the WCS units would only be used for closed-loop solids control applications; (3) WCS bore the financial responsibility associated with modifications required to make the WCS units oilfield ready, and would provide technical expertise to D&D personnel; (4) the WCS units would be well maintained and not abused; (5) Birchell would have full authority regarding operation of the WCS units; (6) D&D would pay WCS $800.00 per day for each day that a WCS unit was staged and ready for use at a drilling location; and (7) D&D would advise WCS of the exact location of the drilling site and exact number of days the WCS unit was staged and ready for use.

D&D informed WCS that the evaluation went well, indicating that it could keep a total of twenty like units in use on an almost constant basis. Accordingly, they ordered, and WCS agreed to supply, ten additional units under the same terms applicable to the original unit. WCS set about importing and customizing the centrifuge units. The average cost to WCS for each unit was approximately $400,000.00.

Chapman approached WCS with a request that the authorized use of the WCS units be expanded to include reserve pit closures. WCS declined the request, concerned of serious damage to its units. Meanwhile, unbeknownst to WCS, D&D proceeded to perform reserve pit closure services using the leased units, in violation of the agreement. Chapman entered into an agreement with Devon Energy to do so, and Rottner knew of and supported such agreement. After WCS had provided three of the contemplated ten mobile dewatering units, Rottner cancelled his order for the remaining seven and announced that D&D would be redeploying one of the leased units to reserve pit closure within a week.

Based on the foregoing, WCS alleges that: (1) D&D breached its agreement with WCS with respect to the units WCS provided in various respects; (2) D&D breached an agreement it had with WCS to purchase two generators; (3) D&D, Chapman, and Rottner fraudulently induced WCS to enter into and continue its business relationship with them; (4) D&D, Chapman, and Rottner negligently misrepresented that there was a market for closed-loop systems sufficient to keep twenty WCS units in operation on an almost

7

constant basis; and (5) D&D was unjustly enriched by materials and services provided by WCS.

II.

Analysis

Defendants contend that the court should abstain from hearing this action pursuant to the doctrine set forth in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). Under Colorado River, the court may abstain from a case when it is part of parallel proceedings pending in federal and state court. Brown v. Pacific Life Ins. Co., 462 F.3d 384, 395 n.7 (5th Cir. 2006) (citing RepublicBank Dallas, Nat'l Ass'n v. McIntosh, 828 F.2d 1120, 1121 (5th Cir. 1987)). Abstention is typically appropriate only under "exceptional circumstances." Brown, 462 F.3d at 394-95 (quoting Kelly Inv., Inc. v. Cont'l Common Corp., 315 F.3d 494, 497 (5th Cir. 2002)). See also Colo. River, 424 U.S. at 813 ("Abstention from the exercise of federal jurisdiction is the exception, not the rule."). The court considers the following six factors in determining whether "exceptional circumstances" exist:

> 1) assumption by either court of jurisdiction over a res, 2) relative inconvenience of the forums, 3) avoidance of piecemeal litigation, 4) the order in which jurisdiction was obtained by the concurrent forums, 5) to what extent federal law provides the rules of decision on the merits, and 6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

Stewart v. Western Heritage Ins. Co., 438 F.3d 488, 491 (5th Cir. 2006). See also Brown, 462 F.3d at 395 (citing Colo. River, 424

U.S. at 818).[4] Additionally, "[t]he Supreme Court has noted that 'the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under Colorado River.'" Allen v. La. State Bd. of Dentistry, 835 F.2d 100, 105 (5th Cir. 1988) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 18 n.20 (1983)).

"[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone Mem'l Hosp., 460 U.S. at 16.

A. The Two Actions are Parallel.

Before the question of abstention can be considered, the court must determine whether the state and federal actions are parallel. See, e.g., Diamond Offshore Co. v. A&B Builders, Inc., 302 F.3d 531, 540 (5th Cir. 2002). While "[s]uits are 'parallel' if they 'involv[e] the same parties and the same issues[,]'" the United States Court of Appeals for the Fifth Circuit has recognized that "'it may be that there need not be applied in every instance a mincing insistence on precise identity' of parties and issues . . . ." Brown, 462 F.3d at 395 n.7 (quoting McIntosh, 828 F.2d at 1121). Despite plaintiff's insistence to

---

[4]"The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983).

the contrary, a mincing insistence on precise identity of parties and issues need not be applied in this action because, as the allegations discussed above clearly demonstrate, the two actions are parallel.

Focusing on the trees rather than the forest, plaintiff contends that the actions are not parallel because "[o]nly two of the ten parties are the same (D&D and WCS) and only one of the many issues may overlap." Resp. at 11-12. However, as defendants note, "[b]oth suits involve substantially the same parties. WCS and D&D are the primary actors in both lawsuits. . . . [B]oth lawsuits involve only persons or entities affiliated with WCS and D&D." Mot. at 9. The court concludes that the parties are substantially the same.

Further, the state and federal actions involve substantially the same issues, with the state and federal plaintiffs' respective claims each arising from or connected with the same initial transaction between D&D and WCS. The two actions, though perhaps not representing a precise identity of parties and issues, are unquestionably parallel. See Brown, 462 F.3d at 395 n.7; Caminiti and Iatarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698, 700 (7th Cir. 1992) ("It is important to note that the requirement is of parallel suits, not identical suits. A suit is parallel when substantially the same parties are contemporaneously litigating substantially the same issues in another forum.") (quotation omitted).

B.  Exceptional Circumstances.

   1.  Assumption of Jurisdiction over a Res.

The parties agree that neither court has assumed jurisdiction over a res or other property. Citing an unpublished district court case from 1998, defendants take the position that "this factor remains neutral to the Court's analysis." Mot. at 9. Curiously, plaintiff seems to agree. The Fifth Circuit, on the other hand, disagrees, having explicitly "rejected the contention that the absence of this factor is a neutral item, of no weight in the scales. . . . This factor supports exercising federal jurisdiction." Stewart, 438 F.3d at 492 (quotation and citation omitted). See also Murphy v. Uncle Ben's, Inc., 168 F.3d 734, 738 (5th Cir. 1999) ("[T]he absence of this first factor weighs against abstention.")[5]

   2.  Relative Inconvenience of the Forums.

Defendants contend that this factor weighs in favor of dismissal or stay. They concede, however, that it is "not a significant factor in this case given the proximity of the two courts . . . ." Mot. at 11. "[T]he second factor, relative inconvenience of the forums, should be analyzed as to 'whether the inconvenience of the federal forum is so great' that abstention is warranted." Kelly Inv., Inc., 315 F.3d at 498 (quoting Evanston Ins. Co. v. Jimco, Inc., 844 F.2d 1185, 1192

---

[5]There may have been some confusion as to the effect of this factor prior to the Fifth Circuit's holding in Stewart; however, Stewart makes quite clear that "[t]he first factor, therefore, is relevant even if no res exists in the case." Stewart v. Western Heritage Ins. Co., 438 F.3d 488, 492 n.4 (5th Cir. 2006).

11

(5th Cir.1988)). The relative inconvenience of the federal forum is not so great, in and of itself, as to warrant abstention.

   3. <u>Avoidance of Piecemeal Litigation.</u>

This factor weighs heavily in favor of abstention. In connection with this factor, "'[t]he prevention of duplicative litigation is not a factor to be considered in an abstention determination.'" <u>Black Sea Inv., Ltd. v. United Heritage Corp.</u>, 204 F.3d 647, 650 (5th Cir. 2000) (quoting <u>Evanston Ins. Co.</u>, 844 F.2d at 1192). Rather, the court's concern is the prevention of "<u>piecemeal</u> litigation, and the concomitant danger of inconsistent rulings with respect to a piece of property." <u>Stewart</u>, 438 F.3d at 492 (quoting <u>Black Sea Inv., Ltd.</u>, 204 F.3d at 650-51). Identifying the desirability of avoiding piecemeal litigation as a pertinent factor in <u>Colorado River</u>, 424 U.S. at 818, the Supreme Court cited <u>Brillhart v. Excess Ins. Co. of America</u>, 316 U.S. 491, 495 (1942). In <u>Brillhart</u>, the Court held that:

> Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.
>
> Where a district court is presented with a claim such as was made here, it should ascertain whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court. This may entail inquiry into the scope of the pending state court proceeding and the nature of defenses open there. The federal court may have to consider whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, etc.

<u>Brillhart</u>, 316 U.S. at 495.

The questions in controversy in the instant action can better be settled in the proceeding pending in state court. Arguing against abstention, plaintiff contends that:

> The only issue in common between the two lawsuits relates to whether there was a breach of the agreement between WCS and D&D for WCS to provide Mobile Dewatering Units to D&D. . . . The remaining claims are not dependent on whether there was a breach of the agreement between the parties, but rather focus on the actions of the parties outside that agreement.

Resp. at 19. Plaintiff's characterization of the two actions actually supports the conclusion that maintenance of both suits would necessarily involve the piecemeal resolution of the parties' claims and causes of action.

The business relationship between WCS and D&D is at the core of both actions. Essentially, WCS complains that D&D engaged in unsavory conduct, which caused WCS to enter into and continue the relationship, and that D&D breached resulting agreements. D&D, on the other hand, alleges that WCS breached the lease agreement and that, once the business relationship had begun, WCS and its agents and affiliates were the ones engaged in unsavory conduct, stealing D&D's business and employees.[6] As the two actions currently stand, a resolution of the instant action would only address WCS's complaints, leaving most or all of D&D's complaints--which were raised first incidentally--to be resolved

---

[6] In their motion, defendants take the position that "[a] comparison of the state and federal court pleadings reveals diametrically opposite allegations--only one version of which can be vindicated by the finder of fact." Mot. at 10. The court disagrees. Given the timing of the alleged untoward conduct, a finder of fact could agree, in whole or in part, with the version presented by D&D, the version presented by WCS, both versions, or neither version.

13

piecemeal in the state court. Insofar as WCS argues that D&D breached the lease agreement, such breach could be raised in state court as a defense and/or counterclaim. As noted above, WCS and D&D are the primary actors driving each litigation. All other defendants are either current or former employees or affiliates of either WCS and D&D. Accordingly, the court concludes that the claims of all parties in interest can satisfactorily be adjudicated in the state proceeding.

This conclusion finds support in Fifth Circuit authority. In <u>Stewart v. Western Heritage Insurance Co.</u>, the Fifth Circuit found that the danger of piecemeal litigation favored abstention. 438 F.3d at 492. In that case, a default judgment in a wrongful death claim had caused Boardwalk Lounge, Inc. ("Boardwalk") to file for bankruptcy. Stewart, Boardwalk's sole shareholder, officer, and registered agent, filed suit in federal court, alleging breach of insurance contract and bad faith. Meanwhile, the trustee for Boardwalk filed suit in Mississippi state court, naming the insurance company Stewart had sued, Stewart, Phillip Dunn ("Dunn") (an insurance agent), and others as defendants. <u>Id.</u> at 490. Recognizing that no property was at issue and that a plea of <u>res judicata</u> after the completion of one of the suits could eliminate the problem of inconsistent judgments, the Fifth Circuit nonetheless held that "[t]he potential . . . does exist for some piecemeal litigating as the state court is the only forum hearing the breach of the fiduciary duty claims against Dunn." <u>Id.</u> at 492. Though the court ultimately held that the

district court should not have abstained, it concluded that this factor favored abstention.

Insofar as the court in Wise County is hearing several claims intimately related to the subject matter of the instant action but against defendants not present in this action, and for the other reasons discussed in connection with this factor, the court concludes that the danger of piecemeal litigation favors abstention.

4. The Order in Which Jurisdiction was Obtained.

Under the fourth factor, "'priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.'" Black Sea Inv., Ltd., 204 F.3d at 651 (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 21). The parties agree that more progress has been made in the state court action. Such action was filed several months prior to the instant action, and discovery is well under way, with the parties having already scheduled the depositions of several witnesses. On the other hand, this action was commenced on February 1, and the Status Report Order has yet to issue. This factor weighs in favor of abstention.

5. The Extent Federal Law Governs the Case.

The court's jurisdiction in this action is based on diversity, and this action involves only issues of state law. Accordingly, "this factor is 'at most neutral.'" Stewart, 438 F.3d at 493 (quoting Black Sea Inv., Ltd., 204 F.3d at 651).

15

6. Adequacy of State Proceedings.

"The sixth factor is either a neutral factor or one that weighs against abstention." Stewart, 438 F.3d at 493. The court concludes, and the parties seem to agree, that this factor is neutral.[7]

7. The Vexatious or Reactive Nature of Either the Federal or the State Litigation.

The complaint by which the instant action was initiated was, quite clearly, a reactive filing. By notice of removal filed September 28, 2007, WCS and other defendants in the state court sought to remove the state court action to this court. By order signed December 17, 2007, the court remanded it back to state court. See Memorandum Opinion and Order signed December 17, 2007, in No. 4:07-CV-579-A, D&D Power, L.L.C. v. Walker Centrifuge Services, L.L.C., Et Al. In such memorandum opinion and order, the court determined that remand was necessary because removal was untimely, and Birchell, who the court determined had been properly joined and served with process at the time of removal, had not consented to removal. Further, the court agreed with D&D that the removing defendants, including WCS, lacked an objectively reasonably basis for seeking removal, awarding D&D its attorneys' fees. Less than two months later, WCS initiated the above-captioned action against D&D, Chapman, and Rottner, asserting many claims that appear to the court to be compulsory

---

[7]Plaintiff states that "this factor does not support abstention." Resp. at 16. The court agrees, and defendants ultimately concede its neutrality. See Mot. at 14 ("Accordingly, this factor remains neutral.").

16

counterclaims that could have and should have been asserted in the state court action. Even plaintiff seems to concede that the above-captioned action represents a reactive response to the court's prior remand of the state court action. See Resp. at 21 ("Had WCS known that Birchell had been served, it could have timely removed the case to federal court and this Court would still have jurisdiction over D&D's claims.").

WCS takes the position that "[i]f this court decides to consider the prior actions of the parties related to their disputes in deciding whether to stay this case, the facts demonstrate that were it not for D&D's trickery, all disputes between the parties would be in this Court." Resp. at 20. WCS contends that D&D engaged in trickery with respect to service of process on Birchell in the state court action. D&D represented in its original petition that Birchell could be personally served at his residence in Decatur, Texas. He was in fact actually served on August 13, 2007, when the Texas Secretary of State received a copy of citation and the original petition and forwarded them to Birchell in Oklahoma. Meanwhile, WCS was engaged in settlement negotiations with D&D. A letter dated July 25, 2007, sent by Derrick Boyd ("Boyd"), D&D's counsel, to David D. Moshier, an attorney in Kansas, states:

> This letter is being written pursuant to our conversation last week . . . . Last week, you contacted me indicating you represented the <u>Kansas</u>

> defendants[8] named in the [state suit] and inquiring about a possible early resolution of this case.
>
> * * *
>
> At this time, we will agree to withhold service of process as to <u>your clients</u> in exchange for your agreement to accept service on behalf of <u>the Kansas defendants</u> if and when we are unable to reach a resolution of this matter in the next few days.

Pl.'s App. at 71-72 (emphasis and footnote added). Notably, in the July 25 letter, Boyd proposes to withhold service on the Kansas defendants only, not all defendants.

Plaintiff's appendix also contains a letter dated September 7, 2007, from Boyd to Albon Head ("Head"), WCS's local counsel. That letter states:

> Thank you for your phone call to my office of August 24, 2007, indicating that you will accept service and appear as local counsel for the following defendants in the above-referenced case: <u>Charles Walker, Brett Williamson, Walker Centrifuge Services, L.L.C. and Premier Solids Control, L.L.C.</u> . . .
>
> Based upon your representation, we have dispensed with efforts to obtain service through the Kansas Secretary of States's office. Using the September 4, 2007, date of your return, I calculate the answer due date for <u>these defendants</u> to be September 28, 2007.

Pl.'s App. at 74 (emphasis added). Head signed the letter in agreement.

The gist of WCS's contention is that while, on the one hand, counsel for D&D was making agreements with counsel for WCS regarding service upon certain defendants, on the other, it was

---

[8] WCS is one of the "Kansas defendants." In its motion, it states "WCS and some of the other defendants in the state-court case first became aware of this lawsuit on or about July 25, 2007 through settlement correspondence from counsel for D&D." Resp. at 21 (citing the July 25 letter).

making attempts to serve, or had already served, other defendants. The court does not agree that such conduct constitutes trickery. As the excerpts from the foregoing letters demonstrate, the discussions had and agreements made did not concern service on Birchell, Tracy Taylor, or Jeffrey Garner, the non-Kansas defendants in the state court action. The July 25 letter proves that WCS had notice of the state court action by that date, and probably earlier. As its discussions with D&D did not concern the non-Kansas defendants, it could have anticipated at that time that D&D was endeavoring to serve, or had already served, the non-Kansas defendants. That it did not do so does not demonstrate that D&D engaged in trickery.

The court concludes that the vexatious and reactive nature of the federal action strongly favors abstention. See <u>Moses H. Cone Mem'l Hosp.</u>, 460 U.S. at 18 n.20.

### III.

### <u>Order</u>

For the reasons discussed above, and after carefully balancing the important factors, the court concludes that this

action presents exceptional circumstances, which tip the balance in favor of abstention. Therefore,

The court ORDERS that all claims and causes of action asserted by plaintiff in the above captioned action be, and are hereby, dismissed without prejudice.

SIGNED April 30, 2008.

_____
JOHN MCBRYDE
United States District Judge